# UNITED STATES DISTRICT COURT

_____DISTRICT OF____MASSACHUSETTS____

UNITED STATES OF AMERICA

v.

JOHN RYAN

**CRIMINAL COMPLAINT**

CASE NUMBER: M.J. # 03-884-MBB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about __April 15, 2003 through on or about May 28, 2003__ in __Norfolk and Middlesex__ counties, in the District of __Massachusetts__, and in the Southern District of California, defendant did, (Track Statutory Language of Offense)

knowingly and intentionally conspire with others to possess with intent to distribute a quantity of marijuana, a Schedule I controlled substance,

in violation of Title ____21____ United States Code, Section(s) ____841(a)(1)____.

I further state that I am a(n) __Drug Enforcement Administration__ and that this complaint is based on the following facts:

Official Title

See Attached Affidavit

Continued on the attached sheet and made a part hereof:    X Yes    ☐ No

_____
Signature of Complainant
**KEVIN C. HERSEY**
Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,

__August 5, 2003__ @ 2:50 PM at    __Boston, Massachusetts__
Date                                City and State

_____
Name and Title of Judicial Officer    Signature of Judicial Officer
**MARIANNE B. BOWLER**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

**AFFIDAVIT OF KEVIN C. HERSEY**

Special Agent Kevin C. Hersey deposes and states as follows:

1. I am a Special Agent with the United States Drug Enforcement Administration (DEA). I have served in this capacity for over 14 years and am currently assigned to the Boston, Massachusetts Division Office. During my tenure as a Special Agent, I have worked on hundreds of drug investigations. I have written and/or participated in the execution of numerous search warrants resulting in the seizures of large quantities of controlled substances; packing implements and other paraphernalia involved in the manufacture and distribution of controlled substances; large amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances. The information contained in this affidavit was either observed by me or related to me by other law enforcement officers involved in this investigation.

2. I submit this affidavit in support of a criminal complaint charging **John RYAN ("RYAN")** with conspiracy to possess with intent to distribute a quantity of marijuana in violation of 21 U.S.C. §846.

3. This affidavit includes a summary of events that I am personally familiar with as well as observations and knowledge

2

related to me by other DEA and task force agents, and other law enforcement personnel that have participated in this investigation. This affidavit does not set forth all the facts developed during this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that RYAN committed the above mentioned offense.

**Background: suspicious crate shipped from southern California to Dracut, MA *via* Old Dominion Freight Lines**

4. This investigation was initiated on or about May 15, 2003 when the Director of Security at Old Dominion Freight Line ("Old Dominion") in High Point, North Carolina alerted local law enforcement of a suspicious crate that had been given to Old Dominion in southern California for shipment to Dracut, Massachusetts.

5. Officials at Old Dominion provided High Point, North Carolina law enforcement with the Bill of Lading for the suspicious crate. The Bill of Lading indicated that the "shipper" of the crate was *Underwater Equipment Sales* of 317 Catalina Court in Point Loma, CA, and that the "recipient" of the crate was *DVP Diving and Video* at 33 Silva Lane, Dracut, MA.[1] The Bill of Lading

---

[1] 33 Silva Lane is the business address for the Old Dominion facility in Dracut, MA; not for DVP Diving and Video.

3

also contained two (2) telephone numbers for the shipping party, *Underwater Equipment Sales* -- 619-980-0807, and a toll free number, 800-329-3324.

6. Thereafter, North Carolina law enforcement "checked out" the identity of the "shipper," as well as the identity of the "recipient" of the crate. They learned that the "shipper's" address did <u>not</u> exist, and that no business named *Underwater Equipment Sales* could be found in commercial data bases. Likewise, investigators were unable to find any business in Massachusetts operating under the name *DVP Diving Video*. As stated above, the recipient's (*DVP Diving and Video*) address was the freight office for Old Dominion in Dracut, Massachusetts; not an address, commercial or otherwise for *DVP Diving and Video*. Based on my training and experience, I know that this particular technique, sending drugs and contraband to and from fictitious addresses, is frequently used by drug traffickers to ship illegal controlled substances.

7. Based on the foregoing, agents in North Carolina obtained a search warrant for the crate. A subsequent search of the crate revealed that it contained four (4) locked containers, each of which contained marijuana. Almost 235 pounds of a green, leafy substance consistent in odor and appearance with marijuana, were,

4

ultimately, found in the four containers within the crate.[2]

8. After discovery of the marijuana inside the crate, North Carolina investigators contacted DEA in Boston and spoke with me. After listening to the above scenario, myself and other agents decided to have the crate transported to Boston with designs on carrying out a controlled delivery of the crate and drugs to the intended target(s).

**Thursday, May 22, 2003**

9. On Thursday, May 22, 2003, the crate was transported to DEA Boston via DEA aircraft from Greensboro, NC. Thereafter, I contacted the Old Dominion freight facility in Dracut, MA (the intended destination of the crate), and arranged with Old Dominion to deliver the crate to their Dracut facility on Friday, May 23, 2003. After receipt of the crate, I then directed Old Dominion to call the "consignee phone number" provided in the Bill of Lading, (781) 244-2154, and inform the party that the crate had, in fact, arrived in Massachusetts.

**Tuesday, May 27, 2003**

10. On Tuesday morning, May 27, 2003, at approximately 8:00 a.m., Old Dominion received a call from an unidentified male inquiring about the crate. The caller was advised that the crate

---

[2] Based upon my training and experience, 235 pounds of marijuana is consistent with sale and distribution of the drug and not personal use.

5

had, indeed, arrived at Old Dominion in Dracut, and would be available for pickup after noon that day. The caller remarked that if he could not pick up the crate that day, Tuesday, he would come to Old Dominion to pick up the crate the following day, Wednesday, May 28.

11. At approximately 7:20 p.m. on Tuesday, a white, middle aged male -- later identified as John Gillies ("GILLIES") -- arrived at Old Dominion driving a rented *U-Haul* van, and spoke with TFA Shawn Murray ("Murray"); an undercover officer posing as an Old Dominion employee.[3] GILLIES handed Murray the original Bill of Lading for the crate (at issue) and told Murray that he was here to pick a crate. Murray told GILLIES that GILLIES owed Old Dominion money for the shipping and asked GILLIES for his driver's license. GILLIES handed Murray a New York State driver's license in the name of "Robert Burgess" of 774 Elizabeth Street, Utica, NY. However, the Burgess' license depicted a photograph of GILLIES. Shortly afterwards, GILLIES handed Murray the exact amount of money owed Old Dominion in cash -- $359.02

12. In the course of their conversation, Murray asked GILLIES if he worked for *"DVP."* GILLIES answered "yes," but that he was only picking up the crate. GILLIES also told Murray that

---

[3] In a subsequent conversation with Murray on May 27, GILLIES told Murray that he had rented the U-Haul van in Lynn, MA.

6

he was "late" picking up the crate, because "they" had been out "working" all day. In response to this remark, Murray asked GILLIES what he did for "work." This time, GILLIES answered that he was a "mover"; a response inconsistent with his earlier affirmative response to Murray's question whether he worked for "DVP."

13. After Murray took payment for the crate's shipping, and made a xerox copy of the "Burgess" New York state driver's license, GILLIES asked Murray if he could measure the crate to be sure that it would fit inside his truck. (GILLIES mentioned that he was not sure whether his rented truck would be big enough to contain the crate.) Murray said that would be okay and, moreover, told GILLIES that he (Murray) wanted GILLIES to carefully examine the crate because the crate had been accidently dropped from a fork lift. GILLIES replied, "you dropped it?" Murray stated "yes" but told GILLIES that the crate did not appear to be damaged. Murray pressed GILLIES to examine the crate because since the crate had been clearly marked "FRAGILE," and because the Bill of Lading reflected that it contained "test equipment," Murray was concerned that its contents may be damaged. GILLIES responded, "it should be fine, they pack them up good." GILLIES also stated that he was "sure it was fine," since "there was nothing breakable in there."

14. Following this exchange, Murray and GILLIES walked to the loading dock area for the purpose of identifying and locating the crate. While Murray pretended not to know *where* the crate was located, or *what* the crate looked like, GILLIES, from almost 25 feet away, pointed to the crate and said, "there it is." (Murray, later, related to me that other than one or two red *FRAGILE* stickers, and two computer printout sheets unreadable from their vantage point, there were no distinguishing marks on the crate.)

15. After locating the crate, Murray (and the fork lift driver) assisted GILLIES in loading the crate into the *U-Haul* van. After several attempts, they were unable to squeeze the crate into the rented van. As a result, GILLIES told Murray that he would try to get a bigger truck and would come back to Old Dominion the next day. Murray told GILLIES that he (Murray) was only working to 3:00 p.m. on Wednesday. In response, GILLIES told Murray that either himself or someone else would be there (at Old Dominion) by 3:00 p.m. the next day.

16. After departing Old Dominion in the U-Haul van, GILLIES was followed by agents to a U-Haul rental facility located in Somerville, MA. Surveillance agents observed GILLIES arrive at the U-Haul facility at 8:15 p.m. and drop off the van. Approximately three to five minutes later, agents observed GILLIES inside the back seat of a grey, Ford Taurus (MA Registration

8

RT1132) that was parked adjacent to the U-Haul facility. (The grey Ford Taurus was registered to a "John RYAN, Jr.," 62 Country Club Drive, Dedham, MA.)

17. GILLIES was observed sitting in the back seat of the parked Taurus for almost ten (10) minutes in the company of two (2) white males seated in the front seat. After that, GILLIES exited the grey Taurus, walked a short distance to a red, Buick Riviera (Ma. Reg 7515WH) that was registered to John Gillies, 18 Emmanuel Street, Revere, MA. GILLIES was followed to a convenience store on Main Street in Malden, MA where he made a telephone call at a public payphone. After GILLIES departed the store, surveillance was interrupted. A short time later, the red Buick Riviera was spotted parked adjacent to 28 Walnut Street, Malden, MA.

**Wednesday, May 28, 2003**

18. At approximately 5:05 p.m. on May 28, 2003, GILLIES returned to the Old Dominion facility in Dracut. This time, however, GILLIES was operating a mid-size *Penske* rental moving vehicle.[4] GILLIES entered the office, approached Murray. Murray asked GILLIES if he had a bigger truck. GILLIES replied, "yes."

---

[4] About 12:30 p.m. on May 28, employees of Old Dominion received a call from an unidentified male who inquired about the crate and stated that he had been there the previous day, and that he had dealt with "Shawn." The male also stated that he could not be there until 5:00 p.m.

9

Murray asked GILLIES if *he* (GILLIES) had to pay for the other truck (the U-Haul van). GILLIES replied the company whose "stuff" that he was picking up was paying. Murray then said to GILLIES, "I thought you said you worked for them?" GILLIES replied, "I work for *Bain Movers* on the Lynn Way in Lynn," that he did moving "side-jobs," and that was what he was doing there.

19. After GILLIES backed his truck up to the loading dock and while the crate was loaded into the *Penske* truck, Murray asked GILLIES what kind of work "*DVP*" did. GILLIES said he did not know. When Murray asked GILLIES whether he (GILLIES) expected to get caught in traffic, GILLIES said that he thought he would, because he was taking the crate to Lynn in order to store it at the *Bain* warehouse overnight. Moreover, GILLIES added, someone else would be picking up the crate tomorrow (Thursday) in order to deliver the crate to "Martha's Vineyard." When Murray asked GILLIES why the crate was going to Martha's Vineyard, GILLIES stated that is where the company is located; referring, I believe, to *DVP Diving and Video*. Finally, when Murray commented that the Vineyard was a good place for a diving business, GILLIES agreed with him.

**Surveillance of GILLIES from Dracut, MA to the "Storage Shedd" (Unit #418) in Canton, MA**

20. At approximately 5:20 p.m., GILLIES departed Old

10

Dominion and headed south on Route 93. At approximately 8:00 p.m., GILLIES and the *Penske* truck were surveilled entering the parking lot of a liquor store in Canton, MA (some 20 to 30 miles south of Lynn, MA). The *same* grey, Ford Taurus observed the previous night in Somerville, MA and that, at the time, contained two male occupants, was also in the parking lot. Within a minute, the grey, Taurus exited the parking lot followed immediately by GILLIES and the *Penske* truck. At approximately 8:15 p.m., both vehicles arrived at the Storage Shedd located at 275 Bailey Street in Canton, MA.

21. A short time later, I observed GILLIES exit the *Penske* truck and approach a digital keypad at the entrance of a security gate surrounding a very large number of individual storage units all contained in three (3) separate buildings. While GILLIES stood over the keypad (and appeared to be touching buttons on the keypad as if he was entering a code) the security gate began to open. GILLIES then re-entered the *Penske* truck, drove into the gated area followed by the grey, Taurus, and drove the Penske truck to Unit #418 where he parked.[5]

---

[5] I learned from one of the employees of The Storage Shedd that the access code used by GILLIES to open the gate that evening was the same access code assigned to the lessee of Unit #418. I also learned that the lessee for Unit #418 was David Martino of 198 Beacon Street, Boston, MA. When I reviewed the Application for Use and/or Occupancy for Unit #418, I examined the xeroxed MA driver license for David Martino (and his photo) and concluded that the male depicted in the Martino license was GILLIES.

11

22. A short time, after GILLIES exited the *Penske* truck, I approached him and engaged him in conversation. When I asked him his name, he replied "John Gillies"; a different name than the one he gave to Murray at Old Dominion. When I asked GILLIES what he was doing, he replied that "he was working." When I asked him what he did for work, he pointed to his T-shirt that read "Bain Moving Company." When I asked him what he was moving for "Bain," he replied, "I want a lawyer." When I told GILLIES that he was not under arrest and that I just wanted to know if he was moving furniture or something else, he repeated that he wanted a lawyer. After my conversation with GILLIES and based upon his conduct and statements of the preceding two days, I placed GILLIES under arrest.

**Occupants of Grey Taurus: Ben SILVER and RYAN**

23. At about the same time GILLIES was placed under arrest, other agents approached the two occupants of the aforementioned grey Taurus and directed both men to exit the vehicle. The two individuals were identified as Ben SILVER ("SILVER") and RYAN. As a precaution and pursuant to <u>Terry</u>, SILVER and RYAN were temporarily detained at the scene and questioned about their reason for being with GILLIES and the Penske rental truck (containing marijuana) that night.

12

**Ben SILVER**

24.  SILVER refused to answer questions from agents, however, it was determined that SILVER had two (2) outstanding arrest warrants: a parole violation in a California marijuana case; and a default warrant out of the Cambridge District Court. As such, SILVER was arrested on these warrants.

25.  Incident to SILVER's arrest on the outstanding warrants, agents searched SILVER and the backpack that was in his possession. In particular, agents found: $9,640 in cash from the backpack; a Vermont Non-Driver ID card with SILVER's photograph, but in the name of "Matthew C. Long" (the crate that GILLIES picked up on May 28 had multiple paper labels stapled to it that read "Attention: C. LONG"); three (3) cellular telephones, and handwritten notes bearing the name "John Gillies." When SILVER was asked abut the money he said that the money was *not* his.

**John RYAN**

26.  Likewise, an inquiry of RYAN was conducted during which
he related the following information. RYAN asked the agents what was going on and why there were so many police cars present. When he was told that law enforcement was on a high terrorism alert, he disagreed saying, "no, no that's not it....I've been arrested for marijuana before" -- even though, up to that point, no agent had

13

mentioned marijuana to RYAN. When asked what he was doing at the storage facility, RYAN replied that he "was dropping off a friend, Matthew" --- referring to Ben SILVER but by SILVER's phony name, Matthew C. Long.

27. Before RYAN was informed by agents that he was not under arrest and was free to leave, he was told that the DEA's investigation would be continuing, and that it was likely he would be contacted in the future regarding what, if any, role he had with respect to GILLIES, the Penske truck, and/or the storage facility. After that, RYAN stated that he wanted to speak with agents about his involvement with Gillies and SILVER.

28. Thereafter, RYAN told agents that he would have "to answer for this" --- at the same time pointing to the back of the Penske truck that contained the marijuana. RYAN stated further that he had been hired by SILVER to drive SILVER to the Canton, MA storage facility that night, but that he sold marijuana to only one (1) customer, and would purchase only five (5) pounds of marijuana at a time from SILVER.

29. RYAN was then asked whether he had been involved in other marijuana transactions in the previous months. RYAN replied "yes." When asked how many other transactions, RYAN replied that

14

this was his "second time."⁶ RYAN stated further that he did not know GILLIES, but that SILVER knew GILLIES and that he (RYAN) played only a minor role in this marijuana operation.

30.  RYAN also gave consent for agents to search his vehicle, the grey Taurus. The following items were found and seized: a roll of adhesive tape; multiple plastic bags; a scale; and assorted paper work that referenced notations, names, and telephone numbers; all items consistent, I believe, with the packaging and distribution of marijuana.

**May 29, 2003: search of Unit #418**

31.  In the afternoon of May 29, 2003, after obtaining a warrant to search Unit #418 from Magistrate Judge Judith G. Dein, myself and other agents removed the lock from Unit #418 and search the storage locker.⁷ The search revealed a second large, wooden

---

⁶ Based upon my further investigation, I learned that a previous crated shipment was sent from southern California via Old Dominion Freight and delivered to their Dracut warehouse facility on or about April 15, 2003. Old Dominion further reported to me that the person who arranged for the shipments of *both* crates *and* picked up the April 15, 2003 crate from their Dracut facility was the same person: a "Joshua Goldsmith." Indeed, the search of Unit #418 conducted on May 29, 2003 discovered a second, large wooden crate, duffel bags, several hard plastic containers identical to the ones found inside the crate picked up buy GILLIES on May 28, plastic bags, and a heat sealer. In sum, evidence consistent with RYAN's remark that he was involved with marijuana shipment on not one but two occasions.

⁷ On the evening of May 28, after arresting GILLIES, I learned from the manager of the storage facility that GILLIES (using the false name "David Martino") had rented Unit #418 in November 2002, and that he regularly paid the rent for the unit in monthly cash payments. After searching GILLIES' person incident to his arrest, I also discovered a key ring on his person bearing a key that open the padlock on Unit #418. (In anticipation of obtaining a search warrant, I removed GILLIES ' padlock and replaced it with one of my own to secure the property.)

storage crate that looked identical to the crate that was seized from Gillies' truck on May 28, 2003. In addition, agents discovered several of the *same* hard plastic storage cases (waterproof cases used for camera equipment) in which the marijuana seized on May 28 was also packed. A large quantity of plastic bags, a heat sealer, and a scale were also found inside Unit #418 -- more evidence to indicate that: **1)** a prior shipment of marijuana was received by GILLIES, and probably GILLIES' associates SILVER and RYAN; **2)** that the crate was packed/shipped identical to the May 28 crate seized from GILLIES' Penske truck; **and 3)** that GILLIES, and probably his associates SILVER and RYAN, used Unit #418 to unpack, weigh, and re-pack marijuana in multi-pound amounts into heat sealed plastic bags for subsequent re-sale.

**Probable Cause to arrest RYAN**

32.  Based on the information contained in this Affidavit, all of which is true and accurate to the best of my knowledge, information and belief, there is probable cause to believe that RYAN has violated 21 U.S.C. § 846, and that he knowingly and intentionally conspired with other persons to possess with intent to distribute a quantity of marijuana that was packed in four (4) containers and stored inside the wooden crate that GILLIES collected at the Old Dominion facility in Dracut on May 28, 2003,

16

then trucked to Unit #418 at the Storage Shedd in Canton, MA.


*[signature]*
KEVIN C. HERSEY
Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me
this ___5th___ day of August, 2003.

*[signature]*
MARIANNE B. BOWLER
Chief United States Magistrate Judge